In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-06-022 CV


____________________



WING AVIATION, L.L.C., Appellant



V.



ART BALMANNO D/B/A PAINT BOOTH SERVICES, Appellee






On Appeal from the County Court at Law No. 2


Montgomery County, Texas


Trial Cause No. 03-07-04845 CV






MEMORANDUM OPINION


 Wing Aviation, L.L.C. appeals the trial court's judgment for $11,188.44 in damages
in favor of Art Balmanno d/b/a Paint Booth Services. We affirm the judgment on the
contract claim.

 Wing hired a general contractor, Southwest Refinishing Systems, Inc., to construct
a paint booth facility at the Montgomery County Airport. Southwest subcontracted with 
Balmanno to provide and install the paint booth's exhaust ducts. Balmanno agreed to
additional duct work at the request of Wing's representatives. Balmanno invoiced Wing for
the additional labor and materials but never received payment. 

 Balmanno sued Wing and Southwest for "suit on account" and quantum meruit. The
trial court entered a default judgment against Southwest. After a bench trial, the court held
Wing directly responsible for the additional work Wing requested of Balmanno. The final
judgment found Wing and Southwest jointly and severally liable, and awarded Balmanno
actual damages of $11,188.44, prejudgment interest, and attorney's fees. 

 Wing presents two issues. First, Wing contends that because the express contracts
between Wing and Southwest and Southwest and Balmanno covered the services or materials
for which Balmanno seeks recovery, Balmanno is precluded from recovering from Wing
under quantum meruit. Second, Wing argues there was no open account agreement between
Wing and Balmanno. We address Wing's second issue as it is dispositive. (1)

 In a suit on account, a plaintiff is required to prove: (1) the sale and delivery of
merchandise or performance of services; (2) that the amount of the account is "just," that is,
the prices charged are pursuant to an express agreement, or in the absence of an agreement,
that the charges are usual, customary, or reasonable; and (3) that the outstanding amounts
remain unpaid. Powers v. Adams, 2 S.W.3d 496, 499 (Tex. App.--Houston [14th Dist.] 1999,
no pet.); see also Worley v. Butler, 809 S.W.2d 242, 245 (Tex. App.--Corpus Christi 1990,
no writ); Tex. R. Civ. P. 185. Wing argues Balmanno cannot recover on this claim. Instead,
Wing claims it could only be liable to Balmanno through a "pass through claim," which may
permit a general contractor to bring an action against the owner if the general contractor is
liable to the subcontractor. We disagree.

 The dispute revolves around whether a separate contract existed between Balmanno
and Wing. The controversy relates to Wing's instructions to Balmanno for duct work offsets
and for duct work welding instead of silicone sealing. Balmanno testified that the original
duct-work bid that he provided to Southwest involved twelve exhausts with the duct work
going straight through the roof. Balmanno testified Wing representatives later informed him
that the duct work would require "offsets" because the exhaust fans were moved on the
exhaust plenum. Brian Wing, president of Wing, testified the "offsets" were necessary
because of Southwest's poor planning and Southwest's failure to timely provide Wing with
plans and specifications. Balmanno testified that when he informed Wing's representatives
the offsets were going to cost more, Wing instructed him to do the offsets. Balmanno
completed the duct work according to Wing's instructions. 

 As to the silicone sealing, Balmanno testified he was required to deliver the materials
thirty to forty-five days before installation. In order to comply with the request, he delivered
the stacks prior to preparing them for installation. He explained that rust appears on ninety-nine percent of the flanges his company buys, and any rust is remedied when the stacks are
"cleaned up, primered, and painted" before installation. Balmanno had not yet completed
cleaning, priming, and painting the flanges. 

 According to Brian Wing, the exhaust stacks were "rusting very badly" and the
silicone was coming off. When he expressed his concern in a meeting attended by Gregg
Goza, president of Southwest, Wing representatives, and Balmanno, Goza offered to take the
exhaust stacks back to the shop and rework them. Balmanno testified that Wing requested
the changed duct work and when Balmanno explained it would cost more, Wing's
representatives told him to go ahead with the welding. Balmanno did the welding as
instructed. (2) 

 The contract between Wing and Southwest provided that Southwest would
"[c]omplete electrical wiring, airlines, plumbing and duct work" for the paint booth. 
According to Balmanno, Southwest hired his company to "furnish and install the exhaust
ducts for the exhaust." Balmanno says that offsets requested by Wing representatives were
not a part of his contract with Southwest. He stated that if the offsets had been a part of his
contract with Southwest, Goza would have informed him of it. Brian Wing admitted that
four months before the lawsuit was filed, he acknowledged to Balmanno the changes made
to the intake were "engineering changes." Goza testified Southwest hired Balmanno's
company to install the two air makeup systems, complete the duct work on the exhaust, and
do the elbows and connections for the duct work. Goza testified the extra work by Balmanno
was provided at Wing's request and that the extra work was "in excess of the original scope
of the project." Balmanno introduced into evidence Southwest's letter to Brian Wing in
which Southwest stated: 

 [T]he issues here relate to work performed beyond the scope of work
[Southwest] had contracted [Balmanno] to do. The work [Southwest]
contracted [Balmanno] to complete was in accordance to Standard Building
Codes which all parties had agreed upon when the project was initiated.
[Southwest] paid [Balmanno] accordingly. 


 The billings in question were additions on the job site requested and approved
by WING personnel (i.e. Carlin and Frank). These requests or orders are
recognized in the industry as "Changes of Order" and were given by WING,
therefore to be billed separately and directly to WING as these specifications
were not a part of [Southwest's] contract with either WING or [Balmanno]. 


 Wing asserts the contract between Wing and Southwest was not "complete" until the
offset duct work was finished. Essentially, Wing claims Balmanno's work on the offsets was
part of the Wing/Southwest contract and not a separate agreement. Wing relies on Texas
Wood Mill Cabinets, Inc. v. Butter, 117 S.W.3d 98 (Tex. App.--Tyler 2003, no pet.). In
Butter, the court interpreted "completion" according to its ordinary meaning. See id. at 103-04. The court determined the contract was not completed "until the cabinets were
constructed, installed, and functional." See id. at 104. Applying the same ordinary meaning,
Wing contends the contract between Wing and Southwest was not complete until all the
work, including the extra work, was finished. Butter addressed whether a contractor had
timely filed his statutory lien under the Texas Property Code. See id. at 103-04. The court
in Butter interpreted "completion" because the statutory definition did not apply to contracts
entered into before September 1, 1999. See id. at 104. 

 Wing provides no authority for the application of Butter to these facts. Brian Wing
stated at trial that Wing could make changes "within reason" for the changes to still be
considered part of the contract between Wing and Southwest. Balmanno testified offsets
have never been included in any of his contracts and they are "always the owner's additional
expense." Balmanno stated that out of approximately 2000 duct jobs he has completed, the
welding Wing demanded has never been a requirement. (3)
 

 Sufficient evidence supports the trial court's finding that the extra work requested by
Wing and performed by Balmanno was outside the scope of the original contracts between
Wing and Southwest and Southwest and Balmanno. A separate contract existed between
Wing and Balmanno for the extra work, and this contract is subject to a suit on an account. 
Appellant's issue challenging Balmanno's suit on account claim is overruled. 

 The trial court's judgment is affirmed. 

 AFFIRMED.

 

 _________________________________

 DAVID GAULTNEY

 Justice


Submitted on May 11, 2006

Opinion Delivered August 24, 2006


Before McKeithen, C.J., Gaultney and Kreger, JJ.
1. The trial court's conclusions of law include the alternative theories of "suit on
account" and quantum meruit. Because the trial court implicitly found an express contract
existed between Wing and Balmanno, Balmanno's quantum meruit claim should have been
precluded. See In re Kellogg Brown & Root, Inc., 166 S.W.3d 732, 740 (Tex. 2005). But
cf. Freeman v. Carroll, 499 S.W.2d 668, 670 (Tex. Civ. App.--Tyler 1973, writ ref'd
n.r.e.); Univ. State Bank v. Gifford-Hill Concrete Corp., 431 S.W.2d 561, 574 (Tex. Civ.
App.--Fort Worth 1968, writ ref'd n.r.e.); Clower v. Brookman, 325 S.W.2d 440, 444
(Tex. Civ. App.--San Antonio 1959, no writ). A reviewing court may review the trial
court's legal conclusions drawn from the facts to determine their correctness. Templeton
v. Dreiss, 961 S.W.2d 645, 656 n.8 (Tex. App.--San Antonio 1998, pet. denied); Dallas
County v. Sweitzer, 881 S.W.2d 757, 763 (Tex. App.--Dallas 1994, writ denied). If the
reviewing court determines a conclusion of law is erroneous, but the trial court rendered
the proper judgment, the erroneous conclusion of law does not require reversal. Scholz
v. Heath, 642 S.W.2d 554, 559 (Tex. App.--Waco 1982, no writ). Because the trial court
here rendered the proper judgment, the conclusion of law allowing for Balmanno's
alternate recovery under quantum meruit does not require reversal. 
2. Wing also requested that Balmanno install water heaters known as "hotsy units." 
Wing contends this work was under a direct contract with Balmanno and was the only work
outside the scope of the paint booth contract. Balmanno testified he informed Frank
Zimmerman, a Wing representative, that the job would cost extra and Zimmerman told him
to do the work. Wing paid Balmanno for his work on the hotsy units. 
3. Wing challenges the legal sufficiency of the evidence supporting the trial court's
finding of fact that "Wing Aviation had originally agreed to pay Balmanno directly for the
extra services and charges but then later changed its position and refused to pay for those
services and charges." In addition to Balmanno's testimony, Goza testified that a Wing
representative informed him that Wing would pay Balmanno, but then Wing subsequently
decided the work should have been included in the original contract, and informed Goza that
Wing refused to pay Balmanno. As factfinder, the trial judge determined the credibility of
the testimony. Sufficient evidence exists to support the trial court's finding that Wing agreed
to pay Balmanno for the extra work but later refused to pay.